The 4th District Appellate Court of the State of Illinois has now convened, the Honorable Eugene G. Doherty presiding. Good morning all. Court is calling case number 424-0363, in rigged guardianship of V.R.W., and ask counsel for the appellant to state your name for the record. August Appleton on behalf of Appellant Veronica Babbs. And counsel for the appellee? Yes, John Curley. Counsel for appellee, Ashley Mason. All right. Counsel, you may proceed with your argument. May it please the court. As is clear from the record, Vida Rose Wilkins was conceived and born in March of 2016, out of the relationship of two women who, while unmarried, had a long-standing relationship where they desired to have a child together. Utilizing an untraditional method, Vida was conceived through a man who was intended to not be a legal parent, but to allow my client, Veronica Babbs, to be a legal parent. Nothing in this agreement ever changed. This is a unique circumstance in the case that the court should be looking at the intention of the parents and what was contemplated for this child since her birth. My client, Veronica Babbs, remained an active role in Vida's life all the way through the death of the biological mother. Mr. Albert, let me interrupt for a moment. Do you find any irony in appealing this case and using the legal process, given the fact that your client used no legal process during ample time to do so, to either marry or adopt or formalize the relationship? And you've referred to as a parent. We need to help determine that, in fact, even though it really isn't a factual issue, but it's potentially a legal issue. I'm puzzled that this was such a strong relationship and such a lengthy relationship, that nothing was ever done. Well, I think, Your Honor, the irony, I don't see the irony, because I believe that the parties here intended to have a child together. They were raising that child together. This matter clearly could have been resolved through a legal proceeding that was adjudicated prior to Miranda's passing. That didn't happen, which is why we're here today. However, it is common when people conceive and bear child, when straight couples bear children, that they don't necessarily contemplate the legal relationship adjudicating parentage to the father until something actually happens. And in this case, the only document that was signed by Miranda Wilkins was a short-term guardianship, which is simply not a designation of a guardian. And so I do not believe that there is irony in it. I think it's unfortunate that we're in this position, but it is a fundamental right of the citizens of this country to create families as they see fit. And I think with the three people that were involved, there is no dispute as to this, that they had a right to raise a child as they saw fit, and that's what Miranda and Veronica were doing. Now, going on to Miranda's intent, there was never an attempt to contemplate a Miranda passing. A short-term guardianship form is modifiable by a court. It's severely limited. It can be rejected by a living parent. Now, and it also has a distinct time limit. Now, all of these factors were not really regarded by the court. And another thing that's important to note. What relevance do those factors have? The question is whether the short-term guardianship was valid. I don't think there's any question raised that it was valid. Well, I think that it was signed in front of her. There are at least allegations that it was a product of influence. But I think the issue with the short-term guardianship stems heavily to the visitation issue, which impacts the guardian issue because the short-term guardianship could have been modified to allow visitation. It's not a nomination of guardianship that's approved by a court that's discussed in the A and B case. Further, the short-term guardianship in this matter was extended well beyond the 365 days, and the court's reasoning that it was in the best interest to have Vida remain with Ashley, the court exceeding in statutory authority was clearly prejudicial to Veronica. Well, counsel, I don't think that's an accurate statement. There was a guardianship, a temporary guardianship. That doesn't mean that's an extension of the short-term guardianship. That would have ended at her death. The short-term guardianship? I would agree that the short-term guardianship statute does not contemplate what happens when a parent passes away. It does not explicitly say. And so then they're operating on a presumption, and there's competing presumptions here, the largest of which is the biological father, the presumption that he's acting in the best interest of the child. Can I ask you, what is your client's standing to invoke the father's rights? It seems to me that if you're going to invoke the father's rights and say as long as dad's available, that another guardian can't be appointed, that would also knock out your client's petition. Well, my client has consent from the biological father. The biological father was willing and able to make a decision as to who the appropriate guardian was once he was located. Right. But you've advanced the argument that legally the petition of Ashley should not have been granted because the father was known and available. But why wouldn't that knock out your client's petition as well? Because of the statutory exceptions to the petition, which is when a parent consents to the guardianship that the court retains jurisdiction. And he's only consented to one guardianship. Counsel, didn't the trial court find that Andrew was not willing and able parent due to his lack of involvement? I mean, he's never seen the child. He's never called the child. He didn't want to know about the child. In fact, I believe his testimony was that at this time he was not able to parent the child. Well, I believe that the manifest way of the evidence also goes to the intent of how Vita was conceived and to the role that he was intended to play by agreement with biological mother. So when he was informed that Vita was born in August of 2022, that was not refuted on the record that he did not know about that. He was not aware of the birth prior to that time. And upon becoming aware of the birth, he made the appropriate designations to ensure that my client could properly caretaker. I'm not sure you caught the question. Didn't the trial court find that he was not able to parent the child? The court found that he was unwilling and unable to parent the child. But I think that's against the manifest way to the evidence in his designation. Willing and able also includes the involves making day to day decisions, which can include the designation of the appropriate guardian. A hypothetical that comes to mind is if I counsel if he's not lacking in ability or willingness, there can't be a guardian. Well, he's determined that it's in the best interest of the child that she'd be with Veronica. I think that he's entitled to at least a presumption of that's in her best interest. And again, your honor, I believe that this goes to the unique circumstances of the case. In which my client clearly was a caretaker of this child and involved in the child's life as a parent until the biological mother no longer had the ability to have any say in her rearing. And so moving on to the best interest, I mean, clearly, my client was denied any right to see this child early on in these proceedings. That was highly prejudicial to prejudicial to any best interest finding. And I believe that is in the best interest, even with the delay in this matter. That Veronica be granted guardianship because I believe in the long term of his best interest. That is in her best interest. We have a family here that has concealed her from everybody that was involved in her life prior to her mom passing. This was obviously a traumatic is that losing 1 parent and trauma was further exacerbated by the losing of a 2nd parents. Now, in regards to visitation, I've already touched on that and looking at the court's rulings. Relying on the A and B rule 23 order that stands for the presumption that a parent's designation of a guardian is binding on a court and is determinative. Or it's not sorry, your honor. I saw your reaction. It's not completely binding on a court, but it is entitled to a presumption of the best interest. And once that attaches to a guardianship, if that parent is alive, then that the guardian can deny visitation. Now, in this case, the court found that while the dad's out there somewhere, so we can deny visitation. And when he comes in and he says, yes, we can deny visitation to the mom. That the court basically just decided that it did not need to rely on those new facts and the circumstances. Now, in regards to the investigation of the garden, that item, it's clear from the emails. My client was trying to get an investigation going and nothing much really happened. The child wasn't met with for over 5 months. And this circumstance where you have a 5 year old child who has just lost a parent, those 5 months are huge. That time period and the development of the child's mind and mentality is huge. And looking at this matter, that was utilized to basically impact the child's mentality. And to sway the best interest finding that eventually was made by the court. Now, rule 907 was clearly not followed. And looking at the further rules with this proceeding and my request to substitute a judge. The 900 rules specifically state that an expedited hearing is imperative with a child. And in this matter, when the biological father came to light in October of 22 in pleadings. A hearing on motions did not occur until late April of 23. I understand that some delay was caused by a premature appeal. But there was also a statute saying that the denial of visitation was final and appealable. And further, the denial of visitation has clearly been prejudicial in determining what is in his best interest. What is the remedy you're arguing for? I am arguing in regards to the judge that a new judge be appointed. I'm arguing that my objections to the GAL be sustained and that argument regarding allocations of fees be remanded. And I'm arguing that a motion dismissed should have been granted. And if not, then finding that it was indeed his best interest that she be awarded to Veronica. And that's specific to the 907 issues that you've cited. Well, in the 907 issues, I'm specifically requesting that the objections be sustained. And I believe that there may be a need for further evidence in regards to an allocation of fees. Further, in my reading of. Do you think a fee allocation is within the intended scope of what rule 907 covers? Well, I think what. Child custodial issues. Well, I think that, first of all, the failure to abide by 907, I think, should have swayed the court in some ways regarding the determination of best interest and the reliability of the GAL report. But why? I mean, 907 is about trying to get a prompt determination. I don't think failure to meet the goal militates towards one outcome or the other, does it? Well, I think it goes to the credibility of the GAL's recommendation. Why would the GAL. Why would the GAL's conduct be wrapped up in the 907 issues? Well, the 907 applies directly to the minimum duties of a guardian in life. And so the remedy is to diminish the weight to be put on the GAL's report? Yes, and I believe that there is also some rule 23. Orders in regards to 907 that specifically state of objections to the role of the guardian ad litem are not raised to trial court that they can't be raised on appeal. And so those objections were brought in order to make a record as to how, in my client's opinion, the guardian ad litem was not abiding by his minimum duties. Okay, thank you. And so, in closing, I believe that the record is replete of examples where the basic instructions of our Supreme Court. That the unique circumstances involving the rearing of children be considered in certain aspects. The MJ case and Scarlett both emphasize the parental rights and the unique circumstances that a court must evaluate. And this matter, Veronica Wilkins was in court the very day this petition was filed, stating that this is her child. And that has been ignored since the get go. To the detriment of Vida, and this proceeding has been delayed much longer than was in her best interest. And so we're asking that two wrongs do not make a right, and that this matter should be corrected. As was clarified by the biological father when he came into this proceeding at late 2022. That Veronica Babbs was always intended to be the parent of this child, and she acted as such until it was removed from her. Not by the act of a biological parent, but on the basis of a short-term guardianship form that is not binding on the parent. So therefore, we ask that the trial court be reversed. All right, thank you. Mr. Curley? Thank you. May it please the court and counsel. You know, there are a lot of ways unmarried couples can be considered parents of a child, including same-sex couples. The law does not discriminate against them, and certainly the trial court didn't. But there could have been an adoption proceeding. These parties could have gotten married. Same-sex marriage was legal in Illinois at the time this child was conceived. There could have been co-guardianships pursued. They could have pursued artificial insemination under the Assisted Reproduction Act. But they didn't use any of these methods. They didn't do any of the things that the law says would have solidified a parental relationship between this child and Veronica Babbs. Yet, you know, this case is, I think, an example of what not to do. How not to go about this entire process, and it's put this child in the middle of things. Veronica Babbs didn't do any of the things she could have done until somebody else went into court and filed a petition for guardianship. My client, Ashley Mason, filed her petition, and then later the same day, Veronica Babbs runs into court and tries to, and files her petition as well. So she didn't do anything for years. Now she comes in to claim that she should be considered the parent. And if we look at the history of this case, we can see from the very beginning, this whole episode, if you will, was based on untruths. Supposedly there was a Craigslist ad that was put out by Veronica Babbs that said a married lesbian couple is looking for a sperm donor. Well, we know that wasn't even true. These parties were not married and never did get married. In fact, Veronica Babbs' testimony was that it was her decision not to get married. She didn't want to because the birth mother had problems with alcohol. Counsel, how much of this matters to our decision in the case? How much mattered in the posture in the trial court? That was water under the bridge at that point. We're dealing with the interest of the child. I think that we are. I think that we are, and I agree with that. I bring up the credibility issues only to the extent the trial court, of course, always has to look at that. They can see the witnesses, determine – look at their demeanor, and when we're looking at the best interest of the child, certainly the court has to consider, I think, the history of people that don't tell the truth because the court has to figure out, well, what are we going to look at here, and who do I believe and not believe? If you look at the trial court order, the trial court did this appropriately. They certainly did look at the best interest of the child. In fact, the trial court's order that was entered in this case actually listed those best interest factors that was mentioned in the In Re CD decision from 2020. The court went through and said, look, this child, based on the best interest factors, is at the place she needs to be. Her life is going particularly well, so I do think credibility always matters, but yet you are correct, Your Honor, that ultimately what we've got to do is figure out is what's in the best interest of the child. Now, Appellee's counsel did say that he decided – the biological father decided best interest by signing a guardianship form, but we have to think about the fact that it's not his job to decide best interest. That was for the trial court to decide, not the biological father who had never been in this child's life, knows nothing about the child, knows nothing about Veronica Babs, and knows nothing about Ashley Mason. So the fact that he signed a guardianship form is not what is controlling here. The court has to make that decision, and the trial court did that. Now, there aren't any cases like this that I could find in the appellate decisions or with the Supreme Court, but in looking at best interest, Veronica Babs did not come up with any reasons why the trial court should not go along with the presumption that existed here. That Ashley Mason was the appropriate guardian to be appointed. You know, even the biological mom understood that when she signed the short-term guardianship form. She had a choice on who she could designate as the short-term guardian for this child. If it was so apparent that Veronica Babs was supposed to be a parent, why didn't the mom name her? Well, the inference we can come up with there is the biological mom knew Veronica Babs wasn't the right person, that the biological mom knew Ashley Mason was a better choice. Now, there has been a challenge to some extent to that short-term guardianship form. The challenge that was made to that form by Veronica Babs was that it shouldn't be considered valid because when the biological mom, Miranda Wilkins, signed it, she wasn't drunk enough. She was an alcoholic, and she couldn't function unless she had a lot of alcohol in her system. Obviously, the trial court rejected that absurd argument. I would ask the appellate court to do the same. But the short-term guardianship form created a presumption that Ashley Mason was the right person. And in fact, that's what Ashley's petition was based on, was that particular form. The petition for guardianship filed by Veronica Babs was simply based on a designation made by a biological dad. The trial court did not have to accept that form, and in fact, did not accept that form. Here you have a biological dad, again, as I said, who's never been in this child's life, totally absent. He abandoned and frankly rejected any rights he might have ever had from the very beginning. He went into this by saying, I'll impregnate you, Miranda, but I don't want anything to do with this child. I'm totally abandoning any rights I had before they actually ever even come into existence. I don't want them now, and I'll never want them. So the trial court was well within its purview to say, I'm not going to follow that form. You know, in Nice v. Doan, the appellate court said, we don't have to follow things like consents to adoption. We can reject those. We can instead look at what's in the best interest of the child. And that's exactly what the trial court did here. So the theory under which Veronica Babs proceeded was one of saying to the trial court, you have to follow this form. You have to do what the biological dad said, and that's simply not consistent with the law, and the trial court rejected that argument. There's also been an argument here that the trial court lacked jurisdiction to proceed on Ashley Mason's petition. But if you look at Section 11-5B of the Probate Act, that provision specifically allowed the trial court to proceed. Why is that? Well, because the biological father initially couldn't even be found, at least as far as we know. But even once he was found, it was very clear that he was not a willing and able parent. He did, at various times in this case, sign and submit affidavits stating that he was willing and able. But when we got to trial in the case, he admitted that he was not willing and able. He said, I've got my own family. I've got my own wife. I've got my own kids. They don't even know this is going on. I've never told them. Given those circumstances, I'm not able to take care of this child. So the trial court clearly had jurisdiction to proceed because Mr. Horace was not a willing and able parent. Never has been, never will be. And he admits that. And the trial court found as such. The issue here of who should have been appointed guardian really does come down to the best interest of the child. Veronica Babbs had the burden of overcoming the presumption that Ashley Mason was the appropriate person to be the guardian. He really didn't provide the court with any substantial evidence, and frankly, not much at all, to establish that she, as opposed to Ashley Mason, was the right person to be the guardian. And if we look, and I won't state the factors specifically, but the court's well aware of what those factors are. But all you have to do is look at the evidence in the trial court about this child. She calls Mr. and Mrs. Mason mom and dad. She treats Mr. and Mrs. Mason's biological parents as her own sibling. She is included in all family functions and is treated by the Masons just like their own children. Her performance in school has skyrocketed, has been glowing since she moved in with the Masons. I believe her test scores show that she is in the top 75th percentile on advancement in school. Yet, Veronica testifies that if she gets this child, she's going to move the child to a completely different county, to a completely different school district. It makes no sense. Why would you do this to the child? She's doing so well. Everything is going so wonderfully for her. That should not be changed. The trial judge was in the position to evaluate the factors and determine best interest, and that's exactly what he did. The child is getting adequate food, shelter, clothing. The Masons own their own house. So they've got a place that's paid off, a place for her to stay. What we want in this child's life is stability. Evidence overwhelmingly supported the notion that this child's life is more stable than it's ever been. You know, before the child's mother died, she kind of bounced around from place to place. She doesn't have to do that anymore. She has stability. The trial court's decision on this should only be overturned if it's against the manifest weight of the evidence. And there's simply nothing presented on this appeal by Veronica Babbs to say the trial court decision was against that manifest weight of the evidence. It was a solid decision, well based in the testimony presented at the trial, and should be affirmed. Mr. Curley, what's your view of the applicability of the artificial insemination cases, cases like MJ? Do they give some basis for us to look at an underlying relationship that might be nontraditional? No, and in fact, if you look at the TPS case, that court pointed out that non-assisted reproduction cases and assisted reproduction cases are to be treated differently, and not subject to the same outcomes. You know, if you look at the Assisted Reproduction Act cases, those were primarily based on common law contract claims. For example, we had one case where a gentleman was seeing another woman, lied to her, said he wasn't married, but he encouraged his girlfriend to go through with assisted reproduction. And so what happened was, he said, if you'll do this, I'll take care of the kids, I'll provide support, I'll do what it takes to be a dad. And so those cases came down to common law breach of contract and promissory estoppel cases, or theories, where the birth mother said, look, I went through with artificial insemination because you told me that if I did this, you would provide support. And they would go to the court and say, court, I want you to enforce this agreement. So those cases are different. They're based on a different analysis and do not control the outcome of a case like this, where we do not have assisted reproduction. The other thing that's important about those cases, Your Honor, those cases generally are disputes between the person who gave birth and the person who promised to take care of the child. That is not what we have in our case. Here, the birth mother is deceased. There's no claim against her or no claim brought by her specifically to try to enforce an agreement. So, no, the trial court did not and should not have looked at those cases because they are not controlling in cases like this one. We would also ask the court to affirm the trial court's decision not to follow Mr. Horace's appointment of guardianship for reasons I've already stated. The court does not have to follow that. And it would not have been in the best interest based on the trial court's determination to allow Veronica Babbs to be the guardian instead of Ashley Mason. Just very briefly, there were two other issues raised. One is the GAL fees. If we look at cases like in-rate custody of Cooper and in-rate custody of T.E. and the estate of K.E.S., trial court is vested with broad discretion to determine and allocate fees of the GAL. One of the things trial court is to look at is relative ability to pay. Veronica Babbs didn't put on any evidence at all of inability to pay. In fact, she kind of boasted at trial that she had gotten her job back at the U.S. Post Office that she had been on paid leave from. She put on no evidence of inability to pay. The only evidence we have is she now has her job back at the post office, which would suggest ability to pay. So there was nothing improper about the trial court's determination that those fees should be paid equally by my client and by Ms. Babbs. So again, we would ask this court affirm that part of the decision. Finally, Ms. Babbs has asked that a new trial judge be appointed if this case is remanded. Well, first, the trial court's decision should be affirmed, so it should not be an issue. But there is no evidence presented at the trial court or given to this court to say that the trial judge was somehow biased or predetermined the outcome of this case. The argument made is, well, the judge said, if I extend this short-term guardianship, this won't affect the ultimate outcome. But then Babbs argues, well, it did affect the ultimate outcome because my client, because I lost. It's not evidence of a predetermined outcome or a bias. That's just evidence that the trial court determined all of the factors in favor of my client. So, again, we would ask the trial court affirm, or this court affirm the trial court's decision. It was not against the manifest weight of the evidence. The court properly determined that there was a presumption in favor of my client. Ms. Babbs did not overcome that presumption, and we would ask that it be affirmed. Thank you. Thank you. Mr. Appleton. Yes. You know, I bring the court's attention to the statement in Emory Marriage D.J. that the trial court needs to look at the rights of a child to the physical, mental, and emotional support of the two parents, and that they should not deny parentage just because it falls outside of the scope of the Illinois Parentage Act. Here, the role of the biological father was to enable Veronica Babbs to be a parent. Now, the legal paperwork was not tied up in time before Miranda succumbed to her illness. Now, the reason for not marrying is separated apart from and following the designation of Veronica as an intended parent. And this is something that was not disputed, that she had acted as an intended parent throughout this child's birth. We're looking at the best interest of the child. That doesn't start on the trial date 26 months after the proceeding started. It starts the day that the proceeding started. And in this matter, the best interest of the child, when Veronica said it's in the best interest of the child that I see this child, the court said, no, I can't consider best interest of the child. However, when she comes in and says, well, now I had the biological father, and he says that I'm the parent, then the court starts to consider best interest of the child when the tide is turned, and it goes against Veronica due to the extensive delay. Now, the court needs to be sensitive, not only to the evolving reality of the nontraditional families and their needs, but also the parent's fundamental liberty interest embodied in the superior rights doctrine. The biological father had a limited role, but because the legal channels were not pursued following Vita's conception or birth, he retained his parental rights. And what he has done in this matter, he hasn't changed anything about how this child was raised or intended to be raised. He hasn't met his parental responsibilities. And that's sort of the first hurdle in a guardianship case where there's only one parent living. Has that parent the ability and the willingness to parent? And if not, the court moves on to address guardianship. I'm not sure why that would be a difficult concept. Just the fact of his DNA contribution to this child doesn't prevent the court from acting when he hasn't acted as a parent. Well, I think in looking at his DNA contribution and the court's designation of him strictly as a sperm donor at the trial court, that that's where the parental rights are acknowledged as being obtainable by a non-biological parent. If you look at the TPS and Ashley J cases, those involve disputes between a biological parent and an intended parent. And in this case, if you look at the intended parent statute and what is intended for this child, the father has always acted in the best interest. When he learned about this child, he went to designate the intended parent as being the proper and legal guardian of this child. Now, I think what we're doing is we're denying Vita's intended parentage on the basis of technicalities. Counsel, what did the biological father know about any of these people? Well, in his testimony, he testified that he met these two women, that he talked with him, that he felt that they were responsible. How is he making a determination? What is his belief based on? That Veronica is the appropriate person just because years before she may have been an intended parent, which he thought she was already married, which isn't true. So this whole thing started out with an untruth. What does he know about the best interest of the child? Well, when he made the decision to consent to the adoption and sign the guardianship, he had communications with Veronica. He had been following the nomination of her as an adoptive parent. He had communications with the GAL. He's been informed as to how Vita is doing and still feels that there is an original agreement that it was in her best interest. And if it wasn't for the fact that there was error in the application in regards to visitation, Veronica would be on a completely different footing. Where it's at, this child has been concealed from her for over two years while these proceedings went on, and she's had no contact. That is highly prejudicial, and it was an error of the court. So therefore, we'd ask for the relief requested in our appeal. Thank you very much. I thank counsel for their arguments. The court will take the matter under advisement and issue a decision in due course.